for argument in the third case Monwell Douglas v. Faith Reeves 1825-88. Judge Quam, this is Judge Hamilton just checking in. Can you hear me? We can. Thank you. Good morning. May it please the court. Just because your sanction was overturned doesn't mean you're not guilty. These are the words that prison official Faith Reeves said to Monwell Douglas after he spent a month in segregation on a discipline charge that he later successfully appealed. Reeves did not like that Douglas used his constitutional right to challenge the sanction. She had the power to retaliate against him and she did. This case is on appeal from summary judgment. Douglas is entitled to all reasonable inferences drawn in his favor and a dispute of material fact makes the grant of summary judgment inappropriate. And here are the facts. Douglas's appeal resulted in him being placed under Reeves' supervision. Days later, in response to a request to restore Douglas to his pre-sanctioned living conditions, Reeves responded, because your sanction was overturned doesn't mean you're not guilty. Your job has been filled. I'm not moving your cell. You're not getting your back pay. I'm not changing your classification report. Douglas then filed a written grievance against Reeves. And two days after that, Reeves denied Douglas an opportunity for a Class A apprenticeship position that included increased pay and a time credit against his prison sentence, stating, you're going to get the job I want you to have. Mr. Kojewski, this is Judge Saineev. Before you go too much further down, I just want to clarify, because there was a little bit of inconsistency, please. What exactly is the protected First Amendment activity here from your perspective? We think there's three acts of protected activity. The first being the appeal of prison discipline in which Manuel Douglas appealed a disciplinary sanction against him. And then there was two grievances, the first being an informal grievance and a formal grievance. So the March 28th informal grievance and then the next grievance that was filed after that? Correct. Okay. Thank you. Okay. So under a First Amendment retaliation claim, there's three factors that are analyzed. The first is whether there was protected speech, and that's conceded here. The protected speech is just indicated occurred on those three occasions. The second factor asks whether the plaintiff suffered a deprivation that would deter a person of ordinary firmness from engaging in protected speech. And the third question is whether there was a retaliatory motive or connection between the retaliatory speech and the deprivation. And turning to the third factor first here, we think that rezone words and the timing in this provide at least a question of material fact on whether or not her retaliatory conduct was motivated by Douglas's speech. After he had appealed the sentence, it was granted, he was transferred to her cell block. And in the first meeting between them in the record, she says, because your sanction was overturned doesn't mean you're not guilty. And then she listed off the ways that she could exercise her official discretion, limited as though it was in order to retaliate against them. And that wouldn't go ahead. Go ahead, Judge Hamilton. I guess the question I have is why would a prison official care about the fact that an appeal was and whether Mr. Douglas, in fact, engaged in the misconduct that he'd been accused of and sanctioned for? But you're asking the prison official would care because it comes up the system, right? If he's pursuing his appeal and getting away with it, the fact that he's challenging it in the first instance suggests that he's a troublemaker or a rabble rouser. And there's an inference that can be drawn that the ire that she then demonstrated was directed towards him using the prison official, these sanctioned methods to buck the system. And I think it is a fair inference, a reasonable inference in the record that the prison official would care about the result or the underlying conduct. But another reasonable inference is that he cared about him challenging the underlying conduct. Does the Constitution require a prison, the prison official like defendant Reeves here to treat plaintiff as if he had been declared innocent, exonerated of the wrongdoing? I'm not sure the Constitution speaks to that one way or another. I think it prevents her from retaliating, exercising her official discretion against him on the basis of him engaging in speech. So this conference is being recorded. Only the main conference is recorded. I'm sorry, I had an automated message there. I'm not sure if I missed something. No, we do. We all heard it, I think. Okay. So yeah, I think it's the act of engaging in speech, whether or not he was innocent of the underlying conduct, I don't think is necessarily germane to the First Amendment claim here, other than that it created the conditions under which they could then interact and she could retaliate against him. And so, in addition to Reeves' statements, we also do have timing as an element in this case for there to be an inference, creating a genuine issue of material fact on whether or not there was a retaliatory motive. We have her making the statement at the first opportunity she had to interact with him. And then just two days after he filed an informal grievance, that's when he had brought to her the Class A sanitation position, and she denied him that opportunity. So, Prodzewski, let me ask you, as I understand it, and correct me if I'm wrong, Mr. Douglas was not actually eligible for the Class A recycling job when this issue arose, was he? I think that's a question of fact that remained open in the record, Your Honor. The job offer that he received came with it and offered to be reclassified into that position. We know prior to being disciplined, he was in a Class C position, and we know that he was to be returned to that after the discipline, but no one in the record does it say he was ineligible for a different position. So... Well, I guess what I'm struggling with here is, the broader question, and I appreciate your thoughts about it, is whether there any differences between how we treat, let's say, a public employee's First Amendment claims and a prisoner's claim regarding prison jobs. For example, if a public employee, let's say a police officer, is denied a promotion because he has published a letter to the editor that's critical of the police chief, that's the kind of thing that might be the subject of a First Amendment claim. It seems like what Mr. Douglas is claiming here is, I had a right to be promoted from Class C to Class A, and the denial of that is subjectively serious enough to count as a basis for retaliation. Is that right? I would frame it slightly differently in that it was the denial of the opportunity for any job at all. So we know under the court's precedent that being removed from a job is the basis for a First Amendment claim, and we know that there's no substantive due process right to a job. And so the basis of the complaint is an official exercising their discretion on the basis of retaliatory motive resulting in an adverse consequence to the prisoner, and we have that same pattern here. The job was Manuel's for the taking, but for re-exercising of her discretion. I believe my time is... Yeah, we're into rebuttal, but it has a minute to go. If you have anything further, you can do it, and I'll obviously, Mr. Giudice, give you the two minutes for rebuttal. No, I think I would start by saying the First Amendment speech is conceded here. There is a disputed material fact on retaliatory motive, and that being denied the opportunity for the increased pay and, more critically, the time credit against one sentence would deter a person of ordinary firmness from engaging in protected speech. I have one more question for you, please. Do you agree that the circuit's recent opinion in Holloman forecloses your argument that the refusal to return him to his old cell was a retaliatory action? Yes, Your Honor. Okay, thank you. All right, we'll now turn to Ms. Weiss. Yes, may it please the Court. This case is about a prison official following the Department's policies while managing 100 different offenders and a prisoner demanding to receive more favorable treatment. On March 25th, when Douglas moved to Reed's wing, he asked first to be moved back to his cell. He asked for back pay, and he asked for his old job back or a higher-paying job. And Reed explained to Douglas that she was not in charge of cell placement, there were no jobs available, but that he would get back pay in accordance with policy. And less than a month later, Douglas had a job, which was in the same class as his prior job, he received his back pay, and he was moved out of Reed's wing. So all of the actions about which Douglas is complaining, they're natural consequences of the Department's policy, and they were not retaliatory. As far as the placement in the recreation job versus the laundry job, they're both Class C jobs, so they have the same rate of pay. And Douglas doesn't quantify the hour difference between the two, but quantities are really important here because minor differences are simply insufficient to deter free speech. And all of Douglas's arguments about the differences between the jobs are entirely subjective. Some people might prefer to work less hours, some offenders might really like managing a recreation room, and some offenders might hate doing laundry. So because there's nothing objectively worse about the recreation job versus the laundry job, that cannot be adverse. As far as receiving back pay in accordance with IDOC's policy, that is certainly not adverse. An offender would not be deterred from engaging free speech merely because a prison official followed the Department's policy. And although he had to wait a little bit to receive back pay, that wasn't out of the ordinary because prisoners are paid on a monthly basis, and he requested back pay on March 23rd after the March payments had already been distributed. So he was paid in April. Ms. Weiss, this is Judge Zienief. What about the allegation that Reeves threatened to withhold his back pay going forward? Why wouldn't that deter a person of ordinary firmness from engaging in First Amendment activity? I would say two things. First, that argument truly has been weighed because he never talked about that before. The only time he states that Reeves told him he would not be getting any back is in the middle of his declaration in opposition to our summary judgment motion, document 115 at 3. So the claim on appeal for the first time that Reeves threatened to withhold back pay is unfairly prejudicial because he could have raised a qualified immunity argument. And in his reply brief, Douglas says that we should construe his pleadings liberally, but his declaration is not a pleading. But waiver aside, even if she did threaten to withhold back pay, we're talking about a really small amount of money here. He was only eligible for eight days worth of work, which was a total of $5.40. In the grand scheme of things, $5.40 is not a large amount of money even for prisoners. If you look at his trust account, he spent $150 on commissary in the month of April alone. So a loss of $5.40 is less than 4% of what Douglas spends each month. And Douglas even stated in his summary judgment brief that, quote, there was no benefit to receiving back pay. I would have rejected that amount if it was not an option to do so. That's document 112 at 5. But it's an objective standard here, not a subjective standard. So can we make the determination objectively that $5.40 wouldn't be enough to a prisoner to deter First Amendment activity? It may not be enough. Yes, it is an object. Sorry, go ahead. It may not be enough to Mr. Douglas, but looking at it objectively, can we make that determination? Yes, objectively, $5.40 is a small amount of money. It's only eight days worth of pay. Now, if he had been denied an entire month or two months worth of pay, that might be a different story. Or if he had threatened to take away that amount. But we're talking about such a small amount of money here. So even objectively speaking, that wouldn't be significant enough. Ms. Weiss, could I ask you about the good time credit? And what was Douglas facing if the sanction had been upheld against him? What effect would that have had on good time or release dates? And what effect would the Class A job have had on good time and release dates? You're asking what his sanction that was overturned, how that affected the time that was lost? Well, I'm trying to think about what the stakes for him were in pursuing the protected speech. For the sanction, which as I understand it does typically include loss of good time credits and a change in earning status for those credits, is that right? Correct. It depends on what they lost at their hearing. Okay, but we don't know in this case. There was no such sanction imposed, right? No. Initially, there was a sanction imposed, but after the sanction was overturned, everything went back to the way it was before. So it was as if he didn't lose any time. So the original sanction, he would have lost how much time? I don't know how much. I don't have his... I don't know off the top of my head. His hearing report, that information would be in his hearing report. I don't have that off the top of my head. I think a Class A job, yes. And what about a Class A job? So at the end of the day, prisoners have to tolerate more than average citizens. At least an action taken against him is... Ms. Weiss, sorry. What's the difference in good time credit for a Class A job versus a Class C job? Can you add that? That information is not in the record about good time credits for a Class C job. And Douglas talks about how the Class A job gave him a reduction in his sentence, but that information or job description, none of that is in the record. But I'd like to correct one argument is that Reeve did not deny him the Class A job. She refused to contact a supervisor about reclassing him into that job. So prisoners might have to tolerate more than average citizens. They're not required to have to take their job taken away from them, but they may have to tolerate going through the normal procedures of the job hiring process, and they might even have to accept a job they don't particularly like. The caseworker or case manager can't just contact a supervisor and reclass the prisoner. You look at the policy, offenders' requests for work-specific assignments have to go through the unit management team to make sure that the offender qualifies for the assignment and that the assignment complies with the offender's reentry accountability plan. And he was in a Class C position before, and there's nothing in the record showing that the case managers or other staff members have to contact a supervisor because an offender tells them that a supervisor has assigned them a job. And this would seriously inhibit prison officials' ability to administer the prison and assign jobs because prisoners are constantly claiming that supervisors have offered them jobs when they have not. And prison guards are not required nor expected to believe everything that an inmate tells them under Olson v. Morgan. And if Douglas was unhappy with the job, he could wait 90 days and apply for a different job. His job situation was not permanent. But even if this court finds that all of the actions were adverse, Douglas' claim still fails because there is no causal connection. Douglas' burden is very high for establishing causation as a part of its retaliation claim. And Reid was simply managing her unit when making her decision. As far as the informal grievance and the formal grievance, there's nothing in the record showing that Reid knew about it, let alone that she was motivated by it. Douglas talks about in his reply brief that you can make an inference, but he's confusing inferences with speculation. Simply stating that, as he frames it, given the nature of the grievance, Reid knew about it. That's not an inference. It's pure speculation. But she certainly knows what he had in mind. Excuse me, Ms. Weiss, what would the ordinary course of handling of those grievances be? Sometimes the grievance officer handles it on their own. Sometimes, depending on the nature of the grievance, sometimes they resolve it themselves. Sometimes they have to contact a higher-up to go through it. But there's nothing on, if you look at the grievance form, there's, her signature isn't on it. There's nothing showing that, for example, a checkbox showing that the grievance specialist informed Reid about it. And so Douglas' arguments are purely speculative. But she certainly knew that he had appealed, Ms. Weiss, she certainly knew that he had appealed his sanction because it was overturned, and she specifically mentioned the sanction being overturned to him. So she knew about that protected activity. But, about the administrative appeal? She knew about the protected activity of the administrative appeal. Yes. But, once again, those, the statements that she makes in connection with the administrative appeal do not allow a jury to draw an inference that the adverse actions were connected to the free speech. So the first statement was that, or the March 30th statement was that, I'm not contacting nobody. I'm going to give you the job I want you to have. That has nothing to do with Douglas' administrative appeal. It shows Reid was exercising her discretion in assigning Douglas a control on public safety. As far as the second, or the first statement, just because your sanction was overturned doesn't mean you're not guilty. I think we hit the nail on the head before earlier. Her statement doesn't show that she acted because of the fact that Douglas filed an appeal. At best, her motive was that she felt as if Douglas did threaten the nurse and that it was wrong for the appeal officer to overturn his sanction. And making a decision... Excuse me, Ms. Weiss, but why is that not fairly described as a jury issue? In trying to disentangle her motives there. Because she doesn't refer at all to his appeal. And making a decision because you believe someone is guilty is not acting because someone engaged in a free speech. The statement was just because you got your sanction overturned was not the phrasing? Just because your sanction was overturned, not because you got your sanction overturned. Just because your sanction was overturned. It does seem to refer to the process. I understand the argument, as a factual matter at least, that she might not have cared much about the process and was more concerned about his behavior towards other staff members in the prison. Why is that not a factual issue? This is like Walsh-Getty versus Fox. In that case, the defendant stated he wanted relief from all the plaintiff's allegations. But the allegations that he was talking about, or the speech that he was talking about, were complaints of harassment. And that was not free speech. There were other instances of free speech in that case, but he wasn't referring to that. And here, you cannot make an inference that she was referring to the free speech. If she had said, maybe next time you won't file an appeal, that would be a different story. Or if she had said, you should have just accepted your punishment instead of trying to weasel your way out of that one. That, maybe you could draw an inference. But that's not what we have here. And Reeves did not have to believe that Douglas was innocent or that his sanctions should have been affirmed. And she can act based upon that without there being a First Amendment retaliation claim. Because Reeves did not retaliate against Douglas, this court should affirm the decision below. All right. And if there are no other questions, this court should affirm the decision below. All right. Thank you. Thank you, Ms. Weiss. Mr. Krajewski, you may have three minutes for rebuttal. Briefly, Your Honor. So following up on the last line of questioning, we do contend that what inference to be drawn from Reeves' statement is a question for the jury. The court, we're not aware of any case law holding that there needs to be magic words like appeal or grievance or litigation. We have to have this specific language in order to create a causal connection between the speech and the act. Here, we think that there's enough in the record, which he mentions, overturning the sanction, that that is one reasonable inference the jury could draw, and that should be determined by the finder of fact. Turning briefly to the question of whether the amount of money at stake could deter a person of ordinary firmness from engaging in protected speech, we don't believe that the $5 amount could somehow be held to be objectively unable to deter a person. Manuel Douglas is making 15 cents an hour at the time, and in the case cited in our brief from the Tenth Circuit, Johnson v. Whitney, says that, you know, a pay decrease of $1.41 would likely be de minimis in other contexts, but it is not trivial when considered in a prison setting. And this is precisely the type of factual issue that should be decided by the trier of fact. How do you address the waiver argument on the withholding of back pay? Yeah. Other than we should broadly, I know you have said in your briefs we should broadly construe the plaintiff's arguments and briefs, but where in the record was that particular argument raised? The only place in the record where it appears, what counsel, my friend on the other side of the box said, it was 113, Manuel Douglas' affidavit, and in this part where he lists the litany of responses that Reeves states after he requests his restoration of privileges, and she says your sanctions have been overturned, she lists off you're not getting your back pay. So that's the only place in the record where it appears. We think when liberally construed, that's a threat. That's a statement of future intent of what she's going to do. She has the hollow threat that he was paid, then the grout amount of the complaint really was just a speech. So that is a liberal interpretation of the pleadings, but Manuel Douglas was pro se at the time, and that is a fair read of what he had submitted. Turning to the question of what was the good time credit for the class A job, the only evidence in the record is that he would have had a 90-day to six-month credit toward his sentence. That's at docket 112, 9-10, and docket 113. And if there are no further questions, we would ask that the court reverse and remand for further proceedings. All right. Thank you, Mr. Krajewski. Thank you, Ms. Weiss. Mr. Krajewski, you have the additional thanks of the court for accepting this appointment. Thank you, Your Honor.